We'll hear argument first this morning in Case 17-312, United States v. Sanchez-Gomez. Mr. Kedem. Mr. Chief Justice, and may it please the Court. An appellate court must have statutory as well as constitutional authority for its decisions, and here the Ninth Circuit had neither. Appellate review was not authorized under Section 1291, which applies only to district court decisions that are final, nor under the All-Writs Act. And because the Respondent's criminal cases had ended long before the court of appeals ruled, their due process claims were accordingly moot. On your first point, you didn't mention the collateral order doctrine. What about that? I mean, that's an exception to the 1291 final judgment rule. That's correct. It's a construction that this Court has given to the final judgment rule. We don't think that that applies here, most notably because Respondent's due process claims could be reviewed following final judgment, which is one of the preconditions for application of the collateral order doctrine. In Deck v. Missouri, in 1291 the Court of Appeals ruled that due process claims were not applicable to the final judgment rule. Kennedy, I don't think it necessarily has to affect the trial. Recall here, for instance, that the Ninth Circuit's decision in this case created a split with the Second and Eleventh Circuits. And in both of those cases, there were challenges to the use of physical restraints that came from or came after the fact. But what are the person is convicted, and let's say he does or she does have an appeal on some different points, and they had, and incidentally, and I was shackled during the pretrial, what difference does that make to the outcome? I don't get it. Well, it wouldn't necessarily affect the outcome of the trial, but, for instance, they could have a claim that it affected some part of the pretrial process. They had a suppression motion that was affected because they couldn't contribute to their own defense, they couldn't communicate with counsel. How did that – I saw that argument. How can – how do the shackles affect their ability to communicate with counsel? Well, I would refer you to the allegations that Respondents have made throughout this litigation. So they've made allegations, for instance, that there were criminal defendants who were unable to raise their hands and get the attention of their counsel. I suppose it didn't. I mean, that's the question you're being asked. I mean, suppose that shackling a person, arms and legs, when he goes before the magistrate, does not affect the outcome of his trial where he wasn't shackled. All right? That's certainly possible. The first thing you ask, or would be in that case, the appeals court says, what's the prejudice? There's no prejudice to his outcome. Fine. How does he raise the issue? The question under the collateral order doctrine is not whether a particular litigant or even most litigants who want to raise that type of claim should – are able to get relief after final judgment because they can show prejudice. The question is whether the type of claim by its very nature is one for which a post-conviction The question I asked you, I asked you, how does he raise the issue? I think it would be very difficult in an instance in which there was no allegation that it had any effect on the way that the proceedings unfold. So you're saying if, in fact, it wouldn't, I'm being very hypothetical, absolutely hypothetical, I don't believe it would ever happen, but if by some chance they have a policy in a court, a Federal court of the United States, that people will come in bound and gagged, in body armor, hung upside down, okay, you're saying even if that's so, that person in this country has no way of challenging that order. Is that your point? And if that is not your point, what does he have by way of procedure to challenge the order? The collateral order doctrine wouldn't apply, but they could get. I didn't ask you that. No, I understand. I asked you what does apply. They could get mandamus in that case. There would be a clear abuse of discretion. If they could get mandamus in that case, why can't they ask for mandamus in this case, where, after all, he has been bound without an opportunity, they bound everybody, arms and legs. Now, you can say, well, he won't win. I don't know. Maybe he will win. But that's your point. They should ask for mandamus. The preconditions for mandamus are, first of all, that you have to show clear entitlement to the writ, which Respondents can't show, in part because the district court complied with the Ninth Circuit's existing precedent and with precedent of this court. Is that definite? I mean, is it the case that where, for example, nobody ever thought anybody would do anything like this to a prisoner, but they do something really terrible, but it isn't absolutely clear. And now you're saying because it isn't absolutely clear, there's no remedy whatsoever. Is that what you're saying? Let me push back just a little bit, Justice Breyer, on the premise of your question. This is something that happens in district courts all around the country. It's a practice in roughly half of the U.S. marshal field offices. Other field offices use leg restraints at initial hearings. So I don't want to accept the premise that this is something truly exceptional. Breyer, I know, but my question is procedural. I'm still trying to get an answer. Many cases are not absolutely clear. And I want to be sure what you're telling me is there is no remedy. So in a case where a litigant can't show or even allege prejudice, I think it would be very difficult to get a remedy. But that doesn't differentiate this claim from any number of hundreds of different decisions that a district court makes throughout the course of litigation, which are very difficult to get review of. Kagan. Kagan. I think that the question that's being asked of you is there are a set of claims, potentially, that would not have anything to do with the outcome of a trial or the outcome of a sentencing or even the outcome of a pretrial proceeding, but would implicate a person's interest in liberty. And, you know, whether you want to do, you know, shackling or we've had claims that have to do with forced medication or excessive bail, all of these things arise in the context of a criminal proceeding, but don't have anything to do with the outcomes of that proceeding, just have to do with independent liberty interests that are implicated in that proceeding. And what I think people are asking you is it seems harsh to say that there's really no way of presenting those claims. So I take the point, Justice Kagan, but that is not the due process interest that Respondents have invoked throughout this litigation. I take that point, but it seems as though Respondents have changed their minds a little bit. So, I mean, I think that that's the interest that they're now asserting. So I would say that nearly everything that a district court does is designed to serve multiple interests, not just adjudicating guilt or innocence, but promoting values such as the autonomy and dignity of the litigants, promoting respect for the judicial process and the rule of law. If you were able to Alito Could a detainee in this situation bring a civil action, just as a detainee could challenge conditions of confinement in a civil action? I think if what they were challenging was, in fact, just the liberty component abstracted away from anything related to the way that their criminal proceedings actually unfold, then they might be able to bring a civil suit. And they would be able to do that. Kagan Right, but that seems, I mean, I don't know another case where we've said that the collateral order doctrine rides on whether you have a way of bringing the same claim in an entirely separate proceeding. You know, here's something's happening to you in the criminal process, and you're saying, your brief said, oh, no worries, just go file a civil class action. But that seems like a requirement that we've never countenanced before. Gannon That's correct, but the reason is because no litigant has ever claimed that their claim has nothing to do with the way that their proceedings unfold. Kennedy Well, your answer to Judge Alito indicated to me that you have some doubt whether the civil class action could work. Justice Kennedy Would you agree that if prisoners who were still in the pretrial phase of the proceedings brought a class action and their case later becomes moot, brought a civil class action, brought a civil class action, and their case later becomes moot, that it would still be an existing class because new people would be in the class, would the government object to that class action on grounds that it's an improper class action? Gannon No. Ginsburg There's a problem for these people where the class action isn't there because they are being represented by the Federal Defender. The Federal Defender, as I understand it by statute, may not bring a class action. Gannon That's correct. Ginsburg And these people are not likely to have the wherewithal to hire counsel on their own. So it seems that the class action remedy is more imaginary than real. Gannon I disagree, Justice Ginsburg. There's no suggestion that they wouldn't be able to get pro bono counsel if what they're challenging is a general district-wide policy. Scalia I'm sorry, are they have an entitlement to attorney's fees? Gannon Pardon? Scalia Is there an entitlement to attorney's fees if the class action is successful? Gannon I think that they might be entitled to it. Scalia So it doesn't even have to be pro bono counsel, right? Gannon Not necessarily. Sotomayor Counsel, I frankly have never heard of a class action that would interfere with the pending case, as this one appears it might be trying to do. Part of the claim here is that there's an automatic shackling and that district courts are not pursuant to the statute giving individualized consideration to whether people should be released or not. That second issue will not be susceptible to class treatment of any kind. Gannon That's correct. And the reason that I was somewhat hesitant in referring to the possibility of a civil suit was I think you have to make sure that what the civil suit is challenging is the general policy and not some case-specific decision. But I took the premise of the court is concerned that there's a policy that generally applies that would never have appellate review, and I took that to be the premise of Justice Kagan's question, then that's what a civil suit would respond to. Breyer Now, who do you sue? And, I mean, it's not a 1983 action. This is Federal. You sue the individual marshals. There may be an immunity in Raine, Hagel, et cetera. Who do you sue? You sue the judge? Gannon I think it would be an ex parte suit against the marshal. And the marshal has the marshal service has authority under 28 U.S.C. 566 for maintaining courtroom security, and they're the ones who are applying the policy that's alleged to be unconstitutional. Breyer But what is the cause of action, a Bivens action? Gannon It's a cause of action, as this Court recognized in Armstrong, directly under the Constitution.  So that's a Bivens action. Gannon It's an ex parte action. Breyer So, then, I guess it hasn't been brought before, and if it's unfortunately perhaps, or fortunately, the Court has held we're not creating new Bivens actions. So are you sure that you can bring a Bivens action against the individual marshal? Gannon Just to be clear, Justice Breyer, it's not a Bivens action in that you're not seeking damages. It's an ex parte young suit. Breyer An ex parte young suit. Gannon That's right. Breyer   Which is relatively well established. Breyer Thank you. And strange, they're great. Kennedy One more question, and you've had a lot of questions. Let's assume that we the Court does hold that mandate is, mandamus is proper, because this is extraordinary. Then, a writ of mandate is brought, and it goes to the court of appeals, and six weeks elapsed, but by that time the trial is over. Is it now moot? Gannon It's not moot if Respondents keep their criminal cases alive. I refer you back to the Second and Eleventh Circuit decisions. Those decisions were just regular appellate decisions following, in one case, there was a guilty plea. In the other case, they proceeded to final judgment after a jury trial. So had Respondents appealed, their cases wouldn't have become moot. The only reason that their cases are moot here is because three of them decided to plead guilty and then not appeal, and then charges were dismissed against the fourth. So there's no reason to assume that there wouldn't be an opportunity for appellate review. I would also note that if this Court is concerned in individual cases that there might be a decision with respect to use of restraints against a particular defendant, and then there would be no opportunity for that defendant to get immediate appellate review, this Court already has authority under the Rules Enabling Act, 28 U.S.C. Section 2072, to issue rules authorizing interlocutory appeals in certain categories of cases. That would be far preferable to creating a new fifth category under the collateral order doctrine. First of all, this Court could bring to bear the collective wisdom of the bar. It could make sure that the exception was constructed in such a narrow and specific way. Whereas, when this Court recognizes a new category under the collateral order doctrine Kagan, you are suggesting a civil rule amendment to take care of this kind of order that comes up in a criminal case only? Let me go back to the collateral order, because it seems to me that really does fit this. It's totally to the side of guilt or innocence of the claim. So it's discreet. I don't see why the collateral order wouldn't fit. So in response to the first thing that you said, the Rules Enabling Act allows this Court to make rules, not just in the civil context, but in the appellate and criminal context as well. But to your question about why the collateral order doctrine doesn't apply, I want you to imagine, for instance, a criminal defendant who wants to represent himself. And he says, I know that this is not likely to affect the outcome of the proceedings. In fact, I'm willing to stipulate that it absolutely will not. However, I have a liberty, autonomy and dignitary interest in being able to represent myself, and those are values I can't get back if I'm forced to go to final judgment and appeal after the fact. Alitoson Is there any reason why we would have to address the question of statutory jurisdiction if there's no Article III jurisdiction? No. Mootness would be probably the most straightforward way to resolve the question. Kagan Can I just ask you to finish what you were saying? I didn't understand. You have this hypothetical. And what would we do with a case like that? Well, my point is that there's nothing that differentiates the dignitary and autonomy and liberty interests that Respondents are asserting from similar interests that could be asserted. Kagan I know, but it just left me hanging, because it seems to me that he should have a way of getting that claim, you know, thought about. I think this Court has recognized that because the final judgment rule has its most ardent application in the criminal context, that it is extraordinarily reluctant to undermine the authority of the district judge to cause disruption, to invite gamesmanship from litigants who want to press pause on their proceedings while they get an appeal, that it is extremely reluctant to allow a midstream interlocutory appeal. And remember that Respondents have been conspicuously silent about what should happen during this course of this appeal, whether they have to stop all the proceedings. But if what they're really arguing is that these are interests I can't get back if I'm forced to wait, then it strongly seems to suggest that you would have to halt all the proceedings. And I think it's very hard to imagine a case like Stack about bail claims coming out the same way if every time someone wanted to challenge bail, a denial of bail on appeal, you had to pause the underlying criminal proceedings. There are other differences between the cases that this Court has recognized under the collateral order doctrine as well. First of all, going to the nature of the right, the right that Respondents have invoked, and I understand that they've changed their argument a little bit, but throughout this litigation, they have invoked the right under Deck v. Missouri, which is a right that's grounded in the fairness and accuracy of the underlying proceedings. That's very different from a bail claim. A bail claim also, as Justice Jackson emphasized in his concurrence in Stack, it's the sort of thing that you never have to stop the underlying proceedings in order to review on appeal. And it's also distinct from claims like this Court has recognized in Sell v. United States, where the severity of the physical interest was completely different. In Sell v. United States, which concerned the forcible administration of antipsychotic medication, the argument there was it's such a severe intrusion on my personal integrity that you can never order this against my will, no matter what. Whereas here Respondent's argument is the same restraints that can be applied against me in the detention center as I'm being transported to the courthouse, being held in a cell within the courthouse, and being transported to the courthouse door nevertheless have to be taken off of me during the course of my hearing within the courtroom. Now, that's a completely different order of magnitude. If the Court has no further questions about the collateral order doctrine, moving on to the question of mootness, as I said, I think this is probably the most straightforward way for the Court to resolve the case. Ginsburg. How about the voluntary secession doesn't moot a case? Now this rule is no longer in effect. That's correct. So, but there's many situations in which voluntary secession does not moot a case. That's correct. We are not arguing that the case is moot as a result of the voluntary secession, and the reason is because the policy was ended here as a direct consequence of the Ninth Circuit panel ruling. We are instead saying that the case is moot because Respondent's criminal case is ended, no Respondent took an appeal, and for that reason there was no live controversy with respect to their due process claims. Now, the Ninth Circuit in its en banc ruling said that the reason that the case is not moot is because it was a functional class action. Respondents have entirely abandoned that argument here. They rest instead on the exception to mootness for cases that are capable of repetition yet evading review. Their argument is that some of Respondents are reasonably likely to commit future crimes to get caught, to be prosecuted within the Southern District again, and then to be forced to undergo physical restraints again. But this Court has consistently refused to allow a litigant to keep a controversy alive by making a prediction of his own future criminality. Roberts. Well, it turned out to be true, right? Two of the four were, in fact, arrested again and did go through the shackling again? That's correct. But it was true in cases such as Lane. I think it may have also been true in Spencer v. Kemna. What about Turner, the person who didn't pay, what was it, child support? Sure. There were a few differences with Turner. First of all, that was a case involving civil standards of conduct, not criminal ones. Second of all, in that case, there was an allegation that the litigant had an inability to conform his behavior to the required standards of conduct. He was more than $13,000 in arrears on child support payments with no evident means to pay. In this case, Respondents make no allegation that they are unable to prevent themselves from committing future crimes. Furthermore ---- There is something a little bit different with respect to this crime than most. I mean, this is an illegal entry crime, and I suspect you, in fact, see extremely high levels of recidivism for that crime because people often have their families here. So it's not uncommon that people continue to try to get into the country. That's right. But this Court has never relied solely on probabilities. The point is, in Turner, another distinction is that what was being challenged there was the right of the Court to apply those standards to the litigant. In other words, the litigant's argument was, you cannot apply civil contempt against me under these circumstances because I don't have a right to an attorney and I have no evident means to pay. Here, there's no argument that the rule prohibit the criminal law prohibiting reentering the country illegally can't be applied to Respondents. That's never been their argument, and that isn't their argument here. And this Court has consistently been unwilling to assume that litigants will flout laws that they concede to be valid and, in fact, has assumed the opposite is true. Kennedy, on a pretrial motion to suppress, were the defendants in the room, is he in shackles there? He might be. It depends on the district. You're asking under this policy. Right. I believe that they would be under this policy. You've withdrawn, the United States has withdrawn the policy. If you win, though, will you reinstate it? I think the intention would be to reinstate the policy. All right. Why is it? If a person is denied bail and by the magistrate and he thinks that was unlawful, what's his remedy there? Bail denial under this Court's decision in Stack can be immediately appealed. Because it's collateral order. It's under the collateral order. Well, why is this different? So I think it's different in a few respects. First of all, You've said several times, but if you could just summarize the main reasons why it's different. Sure. So first of all, bail is not a decision about courtroom procedure. By definition, it affects things that happen only outside of the courtroom. And the reason that that matters, Justice Breyer, is because the collateral order doctrine is based on the premise that there are certain orders that can be decided immediately on appeal without having to know anything about the way that the case unfolds. Breyer, I don't know if you agree with that point, but the analogy that I was thinking of is, after all, you deny bail, the person's liberty is constrained, he is in a cell. And here, the person's liberty is constrained, he is in a shackle, and both are fairly important to him. But the difference, you say, is you can continue with the proceedings. So that was the difference Justice Jackson emphasized. There's another difference as well, which is that for a bail claim, the interest at stake is far more substantial. We're talking about whether the litigant would be at liberty or behind bars for the entire duration of their criminal proceedings, which could be weeks or possibly even months.   even months. We're talking about individual hearings which last minutes or possibly hours. So I think it is a very different – the difference is pretty significant. And similarly, we think the nature of the right is very different. Again, I understand that they've changed a little bit what they're conceiving of the right as, but the right that they've invoked under Deck v. Missouri is a right about accuracy and fairness, and that's very different from the bail right. So if there are no further questions, I'd like to reserve the balance of my time.  Roberts. Thank you, counsel. Mr. Kahn. Thank you. Mr. Chief Justice, and may it please the Court. When a district court takes the extraordinary step of shackling every defendant at every pretrial proceeding taking place over a period of months, courts of appeals have authority to review those actions under either the collateral order doctrine or via extraordinary writ. Now, collateral order review under Cohen exists because the decisions here conclusively determined an important question that was entirely separate from the merits, having nothing to do with the guilt or innocence of these particular Respondents, and it was effectively unreviewable on appeal from a final judgment. Kagan Could you speak to the government's view that this is kind of a new theory for you? Well, I think the government is simply wrong. From the district court on, we argued this as a deprivation of liberty under the due process clause. The district court chose to address it as a Fourth Amendment violation, but that was not our theory. The Ninth Circuit, of course, decided this as a deprivation of liberty. They're quite clear about that. They talk about Youngberg v. Romeo and that this is a deprivation of the fundamental right to be free of restraints. Now, we've talked about DECK because DECK talks about what goes on in the courtroom. And the Court said that in DECK, that right, that liberty interest, protects other rights, including the presumption of innocence, the right to consult with counsel and participate in one's own defense, and, of course, the dignity and decorum of the court and the jurisdiction. But that was during Shaping during trial. Yes. It was during the penalty phase of a capital case, Your Honor. What about the rest? There was a suggestion by Ms. Kedem that if the collateral order doctrine were available, that would mean that the criminal proceeding would be stopped in its tracks. Do you agree with that? I think that's just wrong. I mean, there's no stay as a matter of right in these cases. In every case, if somebody wanted to stay, and they'd have to make that decision because, of course, these individuals are individuals not who are detained, but who simply couldn't afford bail. So they are in jail while this is happening. And it's up to them to make a decision whether to ask for a stay, and it's up for the district court in the first instance to decide whether or not it's proper. And then the court of appeals in the second instance, whether or not to allow a stay under equitable principles. And I don't think, if you look at this case, in none of these cases did the individuals ask for a stay of proceedings for just that reason. They were already in jail. But the government has said, I think, if I interpreted correctly, that of course you have a right to challenge this policy. But there are three ways that you can do it. One way is when you appeal a conviction, the person says, and one other thing that hurt me in this process was the shackle before the magistrate. The second way is if this is an extreme case, you're entitled to mandamus, but he thinks it's not an extreme case. The third way is you get your client and with a group of others, you bring an ex parte young action, which is actually the most straightforward, and you challenge the policy against the marshal service and you say just what you've said. So I guess now my question is, going the opposite of where I was, is why not use one of those three? At least if you brought all three, one of them should work, because of course you should have a method of challenging the policy. Let me see if I can hit those seriatim quickly. So in the first instance, this Court has said in Arizona v. Fulminante that when one attacks a final judgment of conviction, seeking to overturn the final judgment of conviction, the Court will do that only for two reasons, one for trial error that occurs in the presentation of the case to the finder of fact, and the other is in cases of structural error having to do with the constitution of the trial process. Deprivation of this right doesn't seem to fit into either of those categories. The second suggestion, I believe, was the class action suggestion, and I note that this Court has never said that the availability of some right or some forum to pursue litigation outside of the instant proceeding was relevant to collateral order jurisdiction or to mandamus, and I'd point to both Stack and Sell as being contrary to that. In Stack and Sell, and Stack, this Court specifically said that the bringing of a statute in the rules of civil class is not an expert on civil class actions, and it's something that we're just unclear about based upon the statute and the rules, but in Stack and Sell, in Stack, this Court specifically said that the bringing of a statute in a separate habeas action in that case was improper. In Sell, Justice Scalia, in his dissent, suggested that the forced medication order could have been challenged in another proceeding, an Administrative Procedure Act challenge, to the order of the Bureau of Prisons to medicate the individual there, and what the Court said, that wasn't relevant to the availability of collateral order jurisdiction in that case. Roberts Well, all of these difficulties that you're mentioning, you'll have the benefit in all these that the government has said it's okay, right? I mean, you've made a lot of progress this morning already. The government has said in all of those three instances, as I understand it, that they think this is something you can do. I mean, I know that doesn't mean it's done, but it certainly makes it a lot easier for you. We certainly appreciate that concession, and we'd certainly examine the alternatives, but I think it's clear that, it's certainly clear that we couldn't do this after final judgment, despite what they've said. I think we can do it from mandamus, and I think this is an exceptional case, as this Court has set it out, because every defendant was shackled without any individualized cause in every pretrial proceeding over a period of months. That's hearings that last 5 minutes, hearings that last many days, through the entirety of their pretrial. Sotomayor, usually when we think about writs of mandamus, it's not that we give them when an issue is super important. It's that we give them when we think the outcome is super clear, and no one could say that about this case, could they? Well, there's two sorts of mandamus that this – two sorts of types of mandamus cases where this Court has allowed or affirmed the issuance of mandamus. One of those cases where there's an absolutely clear rule and the district court seems to be violating that rule. But another species of mandamus is that that the Court authorized in Schlegenhoff and Mallard, and indeed, I'd say even in Cheney, where there's a fundamental unresolved question about the authority of the district court. And we believe the district court had no authority to shackle all these individuals without making an individualized determination that they presented a risk of violence or escape in court. So, counsel, why doesn't that take care of your problem? Well, the court of appeals did, in fact, go forward on the basis of mandamus jurisdiction, and we're perfectly comfortable with that and would be happy if this Court affirmed on the basis of mandamus. So mandamus is available, you think, in these circumstances? Yes. We think it's a viable route to get review of these matters. Did the three-judge panel, they didn't go on mandamus, did they? No. There was established precedent in the Ninth Circuit that collateral order jurisdiction existed to review this sort of claim, and the Ninth Circuit found at the Ninth Circuit panel found collateral order jurisdiction. The court of appeals said that we're going to leave that precedent undisturbed, but because we're not going to address the individual shackling decisions, we're only going to address the policy. We see mandamus as a better route to get at that. Counsel, the government suggests that the functional class action theory to get around the mootness problem you've abandoned. Is that a fair characterization? So I don't know that I'd say we've abandoned it, but we fit squarely within a very clearly established exception to the mootness doctrine, that this matter is capable of repetition, yet evading review. Well, before we get to that, if I could just – if you haven't abandoned it, I don't see a brief, so what am I supposed to do about that? Well, I think this Court's free to affirm on the basis of the Ninth Circuit's opinion without our briefing on the issue. Do you think it's right? You haven't defended it. Well, this Court did something very similar in Richardson v. Ramirez, where there was no certification of a class action, and the Court found that wasn't essential to Article III jurisdiction. But because we have a simple, clear route, we don't want to ask this Court to break new ground for us. Okay. That's helpful right there. Thank you. But you have a decision from the en banc Ninth Circuit saying that this case is not moot based on the fact that it is a functional class action. And it's pretty remarkable that whether you've abandoned the point or not, you certainly have not made any effort to defend it. That's correct, Your Honor. What does that say about this theory? It was adopted by the en banc court of appeals. Well, as to us, it says that we're more comfortable staying within a firmly established exception to mootness that this Court has ruled on many times. But it isn't, because capable of repetition, evasive review, I don't know of any case that has allowed, I'm going to do it again, that I'm a recidivist, therefore, I mean, it will be evasive of review because I'll do it again and again. I don't know any decision that allows you to say, I will commit the same offense again, therefore, the case is moot. Well, let me note that in Gerstein, in footnote 11, this Court said that pretrial detention is necessarily brief, speaking to the individual named plaintiffs, so that no one individual would have an opportunity to fully litigate their claim, and yet the individual could suffer repeated deprivations, making the matter capable of repetition, yet evading review. So this, beyond that, I'd point out that the Article III personal stake requirement is no different for a criminal defendant than a civil plaintiff or a civil defendant. And what this Court has always looked to is whether there's a reasonable expectation or a reasonable likelihood as a factual matter, based upon the facts in the particular case involving the particular litigants. It's not a rule that's intended to control the conduct of litigants outside of the courtroom. It's simply a rule that allows this Court to determine whether or not there remains a live controversy that can be appropriately decided in this Court. So we're at the moment, it's very interesting, helpful, but I'm thinking if we go with you on mootness, I don't know what door that's opening up, because it's really not moot because there are other people that will be subjected to it, not your clients. Then I'm thinking, well, if we go on the mandamus, I'm going to hear just what I heard, that there are a bunch of districts that have this and it isn't as far out as my imaginary example. And then if I go on collateral order, I'm going to run into the problem that we just said, that this would delay the proceeding rather than his like being in bail. And then they say, but bring an ex parte young action, that's fine. And how long would that take? I mean, you find five people down there who are going to be subject to it, and you already have the orders, and there we are, we win. Okay. How long, I mean, am I thinking, you don't think I'm thinking correctly on this, and I guess I want to know. No, I think in a sense you're right that the government's argument is really that there is no way to ever obtain. No, no, they say ex parte young. They say that, but, you know, the truth is that doesn't obtain review of the decisions to shackle these individuals in their cases. And, of course, this Court has already said, I mean, speaking of O'Shea, this Court said in O'Shea that it's certainly not a favored course of action to enter injunctions that will interfere with the conduct of criminal cases. In the normal way, the appropriate way of reviewing decisions in individual criminal cases has always been through appeals in those individual criminal cases. Alito, what is the difference between the case involving allegedly unlawful shackling when a person is brought to a proceeding in court where there is no jury on the one hand, and a case involving, let's say, allegedly unconstitutional shackling while in the jail? In the latter case, would that fall within the collateral order doctrine? No, I don't believe so, because courts don't make decisions in criminal cases about what happens in detention centers. Courts do make decisions about how individuals come before them, about how they are presented in a public courtroom. Well, I mean, insofar as there are two possibilities for your claim. One is that it has some effect on the criminal case. And if that's the claim, then that does not fall within the collateral order doctrine, because that could be reviewed after a conviction. But if the claim is, irrespective of any effect on the criminal case, this is a violation of my constitutional rights because it violates a liberty interest, a dignitary interest, then explain to me what is the difference between those two situations. It's just the happenstance that one occurs in court and one occurs across the street in the jail? Well, we think the fact that it occurs in court is meaningful. I mean, it is, you know, we believe the courtroom really is a sacred space. We believe judges control that space and assure that individuals come before the court with dignity and with autonomy and with their liberty interests protected, and that there was a well-established right at common law that, under this Court's precedence, is incorporated in the due process clause to appear before courts free of bonds. And this happened regularly at the common law. Individuals would come from prison, from Newgate Prison, terrible condition, shackled hand and foot, and without question, their bonds would be struck off for their arraignments. Well, there is the countervailing interest, which, of course, is the safety of those in the courtroom and the safety of the judges. And your scenario of the person coming in from Newgate, I understand that's one individual. Here, according to the record from the marshals, you have many situations where there are a lot of people, and the idea that they're going to undertake an individualized determination in every case is just something that they don't have the resources or time for. Well, I disagree, and I think that the record here shows that not to be the case. I mean, so for nearly 50 years of the district's existence, this procedure was followed. It's the procedure that's been followed since May of 2017 in the district, that individuals come to court, that if the marshals have a reason to shackle them, they usually what happens today is that they come and they tell the lawyer, we're going to bring your client out in shackles for these reasons, and the lawyer can either decide to challenge that before the judge or not, as they choose to. So this procedure has worked through, you know, centuries of common law. Roberts, but there are situations where in turn for pretrial decisions you do have more than one person. I mean, there are, according to what the marshals say, there are many people in the courtroom, waiting to get in the courtroom, and presumably in many cases the lawyer is going to say, I don't want the client to be shackled. And then you have to have an individual determination, right, where the assistant U.S. attorney, whoever it is, comes in and says, well, here's why we think he should, and the lawyer says no, and then the judge has to make a decision on that for every one of however many people are there. So it's just not a why he should or why he shouldn't, it's that there's evidence or there isn't that the individual presents a danger of escape or violence in the courtroom. All I can say is this is done day in and day out, and it's done without a problem. In some districts, for instance, the District of Arizona, particular procedures have been adopted to address these matters before the individual first comes to court. In other districts like ours, the matters are dealt with in court where necessary. Roberts I suppose there are many situations where people don't know much about the individual, right? The situation we have here where, for example, there are many people, like the recidivist clients, obviously you know something, but they arrest somebody and bring them in, and the question is should they be detained, and they don't know anything about them. Well, in our district, they know quite a bit about them by the time they get to court. In our district, individuals don't come straight to court. They go to the MCC. They're interviewed about social issues, which include gang history, that sort of thing. They meet with pretrial services, which runs a criminal history check. There's strip search. So by the time people actually get to court, they know quite a bit about them. But I'd say also that that's reversing a little bit the presumption of the common law. The common law presumes that individuals won't be shackled unless there's cause. And so it's for the marshals or the government to bring up that evidence of cause, and I think they've been able to do that where it's been appropriate, that the individual is acting out in the holding cell, that the individual in the course of his arrest was violent with the officers, that the individual has mental illness that makes him in some way more likely to be violent, some particular examples of it, not just that they're mentally ill. Sotomayor, what are there, 99 districts in the country? Yes. How many of them have had a shackling policy similar to this one? So we don't know that with certainty. The record evidence in this case pertains only to the southwest border and the Ninth Circuit, and some of it was disputed. But what's clear is that the courts along the southwest border from Texas through Arizona had this policy prior to 2013, and then the Southern District of California instituted that policy in 2013. Is it fair to say that that's a small percentage compared to the whole? Certainly it seems that way to me, based upon the record we've got. And in the whole, the individualized determinations are made? Yes. I mean, certainly that's my understanding of many from surveying my fellow defenders that that's the case in many of the districts around the country. You have a higher, a much higher volume of people, don't you, in that part of the country than elsewhere? We do indeed, Your Honor. But we've had that same high volume for pretty much the entirety of, well, I shouldn't say the entirety of the history of the district, but certainly from the 70s on. Can you address the question about capable repetition yet evading review? It's very difficult for this Court, as a matter of the dignity of the law, to say that, oh, we're going to presume there's going to be another violation. We understand that with the aliens, with the families, that they have this strong temptation to try to come in anyway. But it's very difficult for us to write an opinion, oh, he might violate the law again. Well, let me be clear, we're not asking the Court to presume anything. And that's simply because the most likely evidence that something can happen is that it has happened. The most likely evidence that something or the most probative evidence that something is likely to reoccur is that it already has. And this dispute between Respondents and the government has already repeated itself. So it's not merely a probability, it's not merely a presumption or an assumption, but there's actual facts that show it's likely to reoccur.  Kagan. But that suggests, if I look at somebody and he has a very, very, very long rap sheet, I say, well, you know, he clearly does this every month, he's just going to be here again, and give him a different rule from somebody who's a first offender. Well, the Court has always said that in applying the capable of repetition yet evading review exception, the Court looks at the individual case and the individual litigant in determining whether or not it's likely to repeat itself. So the Court isn't creating some rule for all criminal cases in some way. The Court's looking at these cases. I mean, let me note there's also one other Respondent who I think is relevant to this consideration, because the government's made the argument, though I think it's wrong, that both Mr. Smith in Honig v. Doe and Mr. Turner in the Turner v. Rogers were unable to avoid coming back into that situation.  And it's as a result of that that he came into conflict with the VA, where he lives in a VA home and relies on the VA for services. So I think there's also that individual who is likely to come into that same conflict. And the other thing I'd point out is that these individuals, when they come back into court, they are indeed presumed innocent. So the government says, we're asking you to say that this individual is presumed  that they are going to commit new crimes. No, we're asking this Court to find that it's reasonably likely, reasonably expected that they may find themselves in the Southern District of California. Breyer, I'm just curious, because I did have to write this case of the Shackling before. And there's a full page, more than a page, of citations that are not simply from Blackstone, but almost all of them are from American courts. And the conclusion is, trial courts, that what they show for like a century is trial courts may not shackle defendants routinely, but only if there is a particular reason to do so. Now, were those all jury cases? I don't remember. I mean, I know that there's a magistrate here, and it isn't a district court judge, but magistrate judges are in courtrooms. But did all those cases involve juries? Do you know? I don't know with certainty, and I don't want to answer, Your Honor. I would point out, though, that this Shackling occurred not only before the magistrate judges in the initial proceedings, but before district court judges in substantive motion hearings and evidentiary hearings. So it went on. Do you know if Blackstone was, in fact, just talking about jury cases, or if Blackstone was talking about cases in courtrooms? Well, I think it's clear that Blackstone wasn't talking just about jury cases. The very quote that's mentioned in Deck comes from his chapter of arraignment and its incidence, and it talks about the arraignment, about coming into court, being called to the bar, asked to state one's true name, and being informed of the charges and asked to plead. And Blackstone states the rule was that individuals were to appear free of bonds and fetters, absent some evidence that they were at risk of escape. Is it your experience that there's Shackling during a pretrial motion to suppress? There was Shackling at every proceeding, Your Honor, with the exception of one district judge. One district judge out of 30 magistrate and district judges chose not to shackle anyone in her courtroom. Every other district judge, every other magistrate judge shackled individuals. Sometimes there would be partial relief in motion hearings where people would have, you know, handcuffs taken off. But on the whole, five-point shackling was the rule in every court. And you can see that in some of the examples in the record and in our briefs where, for instance, the district court judge who says, I've got a lot to do today, I don't have time to make individual determinations, that's a district court judge talking about what's going on in his courtroom. The woman in the wheelchair who we talk about in the brief in dire and deteriorating condition, that occurred in district court, not in the magistrate court, Your Honor. Suppose there's a rule. Kennedy, in the Central District of California, does this policy prevail, do you know? Shanmugam, Well, it prevails nowhere in the Ninth Circuit any longer. But in the Central District of California, there was a policy of using leg shackles only in the initial appearances only, and that was the Howard case, which was the first litigation ever concerning shackling that established the right to collateral order jurisdiction in the circuit over these matters. Alito, if there is no rule, there's no blanket rule, but an individual district judge orders that a detainee be shackled, do you think that could be contested via the collateral order doctrine? Shanmugam, Well, I think the only thing before this Court is a complete denial of an individual determination on the basis of violence or risk of escape. And so that is clearly a due process violation and subject to the collateral order doctrine. The Court did say in Stack that there's a distinction between the discretionary calls that a judge makes in setting the amount of bond versus the refusal to reduce an excessive bond. And so the Court could construct the jurisdictional rule in that way. Alito, but here there could be you could get an individualized determination. Could you not? I thought under this rule any judge could order that the shackles be removed. Shanmugam, Any judge could order that the shackles be removed, but no judge made an individual determination on the basis of danger or risk of escape. And we asked for that many times and were told again and again and again, you're not going to get that, you don't have a right to that. Some judges said we'll consider medical extremity in determining whether or not we'll remove shackles in whole or in part. But the record is really clear in the Ninth Circuit en banc found that there was really very little variance and there was no individualization in a meaningful way, that this was a blanket case. Sotomayor, going back to what the Ninth Circuit said in their majority opinion, they didn't deal with the mootness issue except through the class action argument. That's correct, Your Honor. They do state in their opinion, however, the principle that was mentioned earlier, that we generally don't presume in their case law that someone will commit a criminal act. The government points to that in saying, absent the class action mechanism, you really can't get past that circuit case law. So if we don't accept the class action mechanism they use, it's a big but, hypothetically. If we don't accept that, shouldn't we just remand and let them decide whether this is capable of repetition or not? So I certainly think that this Court has done that in the past and it's the appropriate course. What happened here was that no one in front of the Court of Appeals contended that the matter was moot because the Respondents had lost their personal stake. And so the Ninth Circuit was never made aware of the underlying facts, including many facts that are in the record. All of the facts concerning Mr. Ring and Mr. Sanchez-Gomez are in the record. But they weren't litigated, they weren't brought before the Court, because neither the government nor we contended that Respondents had lost their personal stake and it just wasn't discussed. So it would certainly be appropriate to remand in the Ninth Circuit for them to make an initial determination. The other thing I'd say is I'd want to come back a little bit to O'Shea and the government. The government is pushing very hard on the idea that this Court has said that it's never appropriate to consider the possibility that an individual come back into court in a criminal case. And the Court has never said the doctrine doesn't apply in criminal cases. And in fact, the language in Gerstein is directly to the contrary of the rule, the new rule, that the government is suggesting this Court adopt. And do you think we could say, well, we don't know whether we have jurisdiction under the Constitution, but we're going to write an opinion on various other interesting legal issues that are presented in this case? No, I don't believe so, Your Honor. I don't believe that's possible. Let me ---- Kagan. May I ask something? It might be, it's probably not legally relevant. I'm just curious about it. At some point, why didn't one of the lawyers in your office pick up the phone? There are a host of organizations that I can imagine bringing a suit like this one outside of any individual criminal case. Why didn't that call get made to one of those organizations? Well, there's no evidence in the record about this, Your Honor. But since, if I might, there has been, we've had this and other issues that have come up where we felt that it would be appropriate to litigate them through class actions, many of which have never led to challenges because we thought they could only be brought through class actions or civil litigation. And the lawyers, the resources just aren't there to bring those cases in San Diego. It's that simple. Thank you, counsel. Mr. Keenum, you have six minutes remaining. Thank you. I have a number of individual points, but I think it's worth pausing to just acknowledge the breadth of Respondent's argument. Respondent's argument is that every single decision to use restraints in any criminal case and possibly other case management decisions as well can get an interlocutory appeal, that compliance with circuit precedent by a district court qualifies for mandamus relief, and that under Article III, a litigant can point to his likelihood of committing a future crime in order to keep his case live. Starting first with the question of mootness, my friend several times brought up Gerstein as an application of the exception for cases capable of repetition yet evading review. It was not. Gerstein was based on the fact that there was a certified class action there. There is no certified class action here. It makes a difference because a class has its own interests that continues even after the individual litigants is over. Respondent's have said that it's just a prediction based on general likelihood, probability that a future crime will be committed. This Court has never relied on those sorts of predictions, and in cases like O'Shea, Lane, and Spencer has explicitly said that a prediction of that sort is not permissible. Finally, he brought up Mr. Ring. At no point during this litigation, not even at the merit stage before this Court, has Respondent ever suggested that Mr. Ring is likely to commit another crime. Going now to the question of the collateral order doctrine. Justice Kennedy, you have several times asked a question, couldn't you have this issue come up in the context of a suppression ruling? The answer is yes, and that would survive final judgment. That could be challenged on appeal even if the litigant was convicted or even if he pleaded guilty. So there is no reason why you can't challenge that as a result from final judgment. Moving next to the question about Justice Kennedy. Sotomayor, assuming your district, like most, doesn't have a waiver of appeal rights with all of their plea agreements. It's routine. It's routine to have the waiver, which means this issue is not likely. Well, it's routine for litigants to preserve suppression objections and to challenge that on appeal. That's something that happens all of the time, and there's no reason that that couldn't happen in a case where someone alleges, for instance, that they were unable to contribute to their own defense, that they couldn't write notes or get the attention of their attorney, as Respondents have alleged here. Justice Kagan, you asked about whether this was a new theory, and my friend said we've been arguing all along that there's a liberty interest. That is completely true, but it's a liberty interest within the context of the common law right under Deck v. Missouri, which is the right that they've been invoking throughout this litigation at all stages, including before this Court. There was a question about whether this is truly an exceptional case sufficient to justify mandamus. We did a survey of U.S. Marshal Field Offices, and our understanding is about half of them use restraints at all initial appearances, about 150 out of the 300 field offices. Another hundred or so. Ginsburg. Is that five-point restraints? That's full restraints. It's both wrist restraints and also leg restraints. Another hundred or so use only leg restraints, and then about 50 field offices don't have any restraints at initial appearances. So the Ninth Circuit is actually very much the outlier here. Furthermore, my friend brought up the idea of the Schlagenhauf case. In Schlagenhauf, the argument was that a type of order that had never been issued before, an order requiring the criminal defendant to undergo a battery of psychological and mental examinations, that's a civil case, wasn't it? That was a civil case. That was a mandamus case. And, Justice Ginsburg, as you might be pointing to, this Court has never recognized an appropriate use of mandamus in a criminal case where the order sought to be challenged was not the functional equivalent of a dismissal. Finally, back to the collateral order doctrine. The doctrine is a balancing of interests. Everyone recognizes that it is useful in certain cases to get an immediate appellate ruling to deal with a particular legal issue, but we also recognize that it can come at a very steep cost. It's incredibly disruptive, it invites gamesmanship, and it undermines the authority of the district judge. We're talking here about a type of order, the use of restraints, that happens hundreds of times in district court cases all around the country. And because they're trying to abstract out the part of their argument related only to dignitary interests or autonomy interests, that argument can't be cabined. It could apply to essentially any decision that a district court makes regarding some sort of trial procedure, as long as you can claim there's no way that it's likely to prejudice me. Usually the assumption is the opposite, that appellate review is there in cases where there is prejudice, and we don't want to change the rules merely because a litigant can claim that there is no prejudice. Breyer. Can you say, I don't know, can you say if the government would, I don't want to put cooperate, that's too strong, but at least would not oppose an effort in any of those 150 districts by a defense attorney's organization to try to challenge this policy, either through, as you suggested, an ex parte young proceeding, or, as you also suggested, an ordinary appeal where they haven't waived the right to appeal and it says explicitly, like reserving the suppression motion, we reserve the right to challenge the restraint motion? Now, there's the other, yeah, hmm? The government didn't in Zuber or Lafon, which were the 2nd and 11th circuit decisions that were from final judgments, didn't contend there that it was improper for the litigant to argue that they had been improperly restrained in those cases. With respect to your question about the civil suit, I can say only that the government would not oppose it in an appropriate case. Thank you, counsel. The case is submitted.